Stephen Joncus, #013075
JONCUS LAW P.C.
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
(917) 236-1200
steve@joncus.net

Robert D. Popper*
Eric W. Lee*
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024
Phone: (202) 646-5172
rpopper@judicialwatch.org

T. Russell Nobile*
JUDICIAL WATCH, INC.
Post Office Box 6592
Gulfport, Mississippi 39506
Phone: (202) 527-9866
rnobile@judicialwatch.org

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| JUDICIAL WATCH, INC.; CONSTITUTION PARTY OF OREGON; SUNI DANFORTH; and HANNAH SHIPMAN,<br><br>          Plaintiffs,<br><br>v.<br><br>LAVONNE GRIFFIN-VALADE, in her official capacity as the Oregon Secretary of State; and THE STATE OF OREGON,<br><br>          Defendants. | Civil Action No. 6:24-cv-1783<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF THE NATIONAL VOTER REGISTRATION ACT** |

*\* Application for admission pro hac vice forthcoming.*

Plaintiffs Judicial Watch, Inc., the Constitution Party of Oregon ("Constitution Party"), Suni Danforth, and Hannah Shipman ("Plaintiffs") file this complaint for declaratory and injunctive relief against Lavonne Griffin-Valade, in her official capacity as Oregon Secretary of State, and the State of Oregon ("Defendants").

1.      Plaintiffs seek declaratory and injunctive relief to compel Defendants to comply with their voter list maintenance obligations under Section 8 of the National Voter Registration Act of 1993 ("NVRA" or "Act"), 52 U.S.C. § 20507. Plaintiffs also seek reasonable attorneys' fees, litigation expenses, and costs, which are available to prevailing parties under the Act. *Id.*, § 20510(c).

## JURISDICTION AND VENUE

2.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, and in particular under 52 U.S.C. §§ 20507 and 20510(b).

3.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant Griffin-Valade's main office is in Marion County and all defendants are residents of Oregon. Venue is also proper in this district under 28 U.S.C. § 1391(b)(2), and proper in this division under Local Rule 3-2(a), because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in Marion County, including (a) the acts and omissions constituting Defendant Griffin-Valade's failure to comply with the NVRA, which occurred in her Marion County office; (b) the consequences of Defendants' failures to comply with the NVRA, which include the fact that, during the most recent two-year measuring period, Marion County removed almost no registrations pursuant to Section 8(d)(1)(B), and did not report critical NVRA-related data to the Election Assistance Commission; and (c) the resulting injuries to Plaintiff Constitution

Party, which is headquartered in Marion County, and to Plaintiff Hannah Shipman, who permanently resides in Marion County.

## PARTIES

4.      Plaintiff Judicial Watch, Inc. ("Judicial Watch") is a not-for-profit, educational organization incorporated under the laws of the District of Columbia and headquartered at 425 Third Street SW, Suite 800, Washington, D.C. 20024.

5.      Plaintiff Constitution Party is a registered political party in the State of Oregon. It is devoted to recruiting and maintaining Constitution Party members and electing candidates who espouse its principles to state and federal office in Oregon. It is currently headquartered in Marion County, Oregon.

6.      Plaintiff Suni Danforth is a resident and lawfully registered voter in Umatilla County, Oregon. Ms. Danforth is a member of Judicial Watch.

7.      Plaintiff Hannah Shipman is a resident and lawfully registered voter in Marion County, Oregon. Ms. Shipman is a member of the Constitution Party.

8.      Defendant LaVonne Griffin-Valade is Oregon's Secretary of State. As described herein, her statutory duties include coordinating state responsibilities under the NVRA; ensuring the uniform application, operation, and interpretation of election laws; issuing directives and instructions to local officials about registration and election procedures; adopting rules concerning the efficient administration of election laws; and enforcing compliance with her directives, instructions, and rules. Her executive offices are in Marion County, at 900 Court Street NE, Capitol Room 136, Salem, Oregon 97301. She is sued in her official capacity.

9.      Defendant State of Oregon is a sovereign state of the United States of America.

**STATUTORY BACKGROUND**

10.    Section 8 of the NVRA provides that "each State shall … conduct a general program that makes a reasonable effort to remove … from the official lists of eligible voters" the names of voters who have become ineligible by reason of death or a change of residence. 52 U.S.C. § 20507(a)(4).

11.    With respect to voters who have changed residence, Section 8 provides that no registration may be cancelled on that ground unless the registrant either (1) confirms this fact in writing, or (2) fails to timely respond to an address-confirmation notice described by the statute (the "Confirmation Notice"). 52 U.S.C. § 20507(d)(1).

12.    A Confirmation Notice must incorporate a "postage prepaid and pre-addressed return card, sent by forwardable mail," asking the registrant to confirm his or her residence address. *Id*. at (d)(2). If a registrant fails to respond to such a Confirmation Notice, and then fails to vote (or contact the registrar) during a statutory waiting period extending from the date of the notice through the next two general federal elections, the registration is cancelled. *Id*. at (d)(1)(B).

13.    Federal and state regulations refer to voter registrations as "inactive" when a registrant has failed to respond to a Confirmation Notice and the statutory waiting period has commenced but has not yet concluded. 11 C.F.R. § 9428.7; O.R.S. § 247.563(3).

14.    A voter with an inactive registration may still vote on election day. 52 U.S.C. § 20507(d)(2)(A). Accordingly, inactive voters are still registered voters.

15.    In June of each odd-numbered year, the U.S. Election Assistance Commission ("EAC") is required by law to report to Congress its findings relating to state voter registration practices. 52 U.S.C. § 20508(a)(3).

16.    Section 8(i) of the NVRA grants the public the right to request information

concerning voter list maintenance. It provides: "Each State shall maintain for at least 2 years and shall make available for public inspection" and copying "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i).

17.     Though not purporting to be an exhaustive list, Section 8(i)(2) provides specific examples of responsive records: "The records maintained … shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made." 52 U.S.C. § 20507(i)(2).

18.     The NVRA provides that "[e]ach State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this chapter." 52 U.S.C. § 20509. Oregon law designates the Secretary of State as this officer. O.R.S. § 246.110.

19.     Under Oregon law, the Secretary of State is responsible for "obtain[ing] and maintain[ing] uniformity in the application, operation and interpretation of the election laws." O.R.S. § 246.110. In carrying out these duties, the Secretary of State "shall prepare and distribute to each county clerk detailed and comprehensive written directives, and shall assist, advise and instruct each county clerk, on registration of electors and election procedures which are under the direction and control of the county clerk," and a "county clerk affected thereby shall comply with the directives or instructions." O.R.S. § 246.120. Further, a Secretary of State may adopt rules considered "necessary to facilitate and assist in achieving and maintaining a maximum degree of correctness, impartiality and efficiency in administration of the election laws." O.R.S. § 246.150.

20.     Oregon law also provides:

> Whenever it appears to the Secretary of State that a county clerk, city elections officer or a local elections official has failed to comply with an interpretation of any election law made by the Secretary of State under ORS 246.110 (Secretary of State as chief elections officer) or has failed to comply with a rule, directive or instruction made by the Secretary of State under ORS 246.120 (Directives, instructions and assistance to county clerks) … or 246.150 (Rules), the Secretary of State may apply to the appropriate circuit court for an order to compel the county clerk, city elections officer or local elections official to comply.

O.R.S. § 246.820.

21.     The NVRA affords a private right of action to any "person who is aggrieved by a violation" of the Act. 52 U.S.C. § 20510(b). Ordinarily, a private litigant is required to send notice of a violation to the chief State election official 90 days prior to commencing a lawsuit. Notice of only 20 days is required "if the violation occurred within 120 days before the date of an election for Federal office." No notice is required if a "violation occurred within 30 days before the date of an election for Federal office." *Id.* § 20510(b)(1), (2), (3).

## FACTS

### *Oregon's Low Numbers of Removals Pursuant to Section 8(d)(1)(B).*

22.     On June 29, 2023, the EAC published its biennial, NVRA-related report, entitled Election Administration and Voting Survey 2022 Comprehensive Report, A Report from the U.S. Election Assistance Commission to the 118th Congress, available at https://www.eac.gov/sites/default/files/2023-06/2022_EAVS_Report_508c.pdf.

23.     Along with this report, the EAC published the responses it received to a voter registration survey it sent to the states. The survey is available at https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys under the heading for 2022, at a link entitled "2022 Election Administration and Voting Survey Instrument." States, in consultation with their own county and local officials, transmit their answers to this voting survey directly to the EAC.

24.     States' responses to EAC surveys are compiled in datasets available online in several different software formats, at https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys. Responses to the most recent survey were published on June 29, 2023. They are available online under the heading for 2022 as "EAVS Datasets Version 1.0."[1]

25.     The largest number of outdated registrations subject to removal under the NVRA usually belong to those who have changed residence. For this reason, the largest number of removals under the NVRA are usually made pursuant to Section 8(d)(1)(B), for failing to respond to a Confirmation Notice and failing to vote in two consecutive general federal elections.

26.     The data Oregon transmitted to the EAC shows that 19 counties removed zero voter registrations from November 2020 to November 2022 pursuant to Section 8(d)(1)(B). The 19 counties are Baker County, Benton County, Clatsop County, Columbia County, Gilliam County, Grant County, Harney County, Hood River County, Klamath County, Lane County, Linn County, Malheur County, Morrow County, Multnomah County, Polk County, Sherman County, Wallowa County, Wasco County, and Wheeler County

27.     The data Oregon transmitted to the EAC also showed that 10 other counties removed 11 or fewer voter registrations from November 2020 to November 2022 pursuant to Section 8(d)(1)(B). These 10 counties are Douglas County (1 removal), Jackson County (11), Josephine County (3), Lincoln County (2), Marion County (5), Tillamook County (1), Umatilla County (3), Union County (3), Washington County (6), and Yamhill County (1).

28.     In all, these 29 counties reported a combined total of 2,404,849 voter registrations as of November 2022. Yet they reported removing a combined total of 36 registrations in the last

---

[1] An updated version of the initial responses ("EAVS Datasets Version 1.1") was published on the same webpage on December 18, 2023, to account for new information submitted by Delaware, Hawaii, West Virginia, and Wisconsin. The Oregon data was unchanged.

two-year reporting period pursuant to Section 8(d)(1)(B) because the registrants failed to respond to a Confirmation Notice and failed to vote in the next two general federal elections.

29.     In Plaintiffs' experience, based on years of enforcing the NVRA, these are woefully inadequate numbers of removals under Section 8(d)(1)(B). There is no possible way these counties can be conducting a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible because of a change of residence while removing so few registrations under Section 8(d)(1)(B).

30.     According to the Census Bureau, 14.5% of Oregon residents are not living at the same residence address as they were one year ago.

31.     According to the Census Bureau, about 157,729 Oregon residents moved out of state in 2022 (the most recent year for which such data is available).

32.     If the identified counties were complying with Section 8(d)(1)(B) of the NVRA, the number of registrations they remove pursuant to that provision in any two-year period should be much higher. In particular, that number should never be zero, in any jurisdiction.

33.     By way of comparison, Curry County, Oregon, with a much smaller total of 19,183 voter registrations in November 2022, removed 1,408 registrations pursuant to Section 8(d)(1)(B) in the last two-year reporting period.

34.     By way of comparison, Lake County, Oregon, with 5,604 voter registrations, removed 330 registrations pursuant to Section 8(d)(1)(B) in the last two-year reporting period. That is still many more voter registrations than were removed under that provision in all 29 identified counties *combined*.

35.     The fact that Oregon's own data shows that more than four fifths of its counties removed few or no registrations under Section 8(d)(1)(B) for failing to respond to a Confirmation

Notice and failing to vote in the next two general federal elections establishes a statewide failure to conduct a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible by reason of a change of residence, for which Defendants Griffin-Valade and the State of Oregon are liable.

36.     The fact that Oregon's own data shows that more than four fifths of its counties removed few or no registrations under Section 8(d)(1)(B) establishes that Defendant Griffin-Valade has failed in her duty, as Oregon's chief State election official, to coordinate State responsibilities under the NVRA.

### *Oregon's High Overall Registration Rates*

37.     A jurisdiction's overall registration rate is (1) the number of its voter registrations, divided by (2) the number of citizens over the age of 18 who live there.

38.     When a registration rate exceeds 100%, meaning that the number of registrations exceeds the number of citizens old enough to register and vote, it is an indication that a jurisdiction is not taking steps required by law to cancel the registrations of ineligible registrants.

39.     In October 2024, Plaintiffs compared the total number of registrants, active and inactive, on Oregon's voter rolls with the most recent five-year American Community Survey estimates from the Census Bureau of the citizen voting-age populations of Oregon's counties. This comparison indicated that 35 of Oregon's 36 counties had more voter registrations than citizens over the age of 18. In other words, these 35 Oregon counties showed total registration rates exceeding 100%.

40.     The foregoing comparison also revealed that Oregon as a whole had significantly more voter registrations than citizens over the age of 18, with a statewide registration rate of 119%.

41.     The high registration rates of Oregon and its counties is evidence of a statewide

failure to conduct a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible under the NVRA, for which Defendants are liable.

42.     The high registration rates of Oregon and its counties show that Defendant Griffin-Valade has failed in her duty as Oregon's chief State election official to coordinate State responsibilities under the NVRA.

### *Oregon's High Percentage of Inactive Voters*

43.     Under Section 8(d)(1)(B) of the NVRA, registrants who do not respond to a Confirmation Notice are marked inactive and removed from the rolls after the statutory waiting period. These removals are mandatory. *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1842 (2018) ("federal law makes this removal mandatory").

44.     Removing registrations that have been inactive for two general federal elections is a necessary part of any effort to comply with the NVRA's mandate to conduct a general program that makes a reasonable effort to remove ineligible registrants.

45.     Having a high percentage of inactive registrations is an indication that a jurisdiction is not removing inactive registrations after two general federal elections as the NVRA requires.

46.     A jurisdiction's inactive registration rate is obtained by dividing (1) the number of inactive registrations in that jurisdiction by (2) the total number of registrations.

47.     The inactive registration rates of Oregon and its counties are excessively high when compared to the inactive registration rate of the nation and the inactive registration rates of other states.

48.     The inactive registration rate for the entire United States is about 11%.

49.     The median inactive registration rate of all individual states where data is available is about 10%.

50.    Oregon's inactive registration rate is about 20%.  This is the highest known inactive registration rate of any state in the nation.

51.    Oregon's median county inactive registration rate is about 18%, and its largest county, Multnomah, has an inactive registration rate of about 27%.

52.    The inactive registration rates of Oregon and its counties are so high that they indicate a statewide failure to conduct a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible by reason of a change of residence, for which Defendants Griffin-Valade and the State of Oregon are liable.

53.    The high inactive registration rates of Oregon and its counties show that Defendant Griffin-Valade has failed in her duty, as Oregon's chief State election official, to coordinate State responsibilities under the NVRA.

### *Oregon's Large Numbers of Old, Inactive Registrations*

54.    Under the NVRA, a registration that was made inactive for failure to respond to a Confirmation Notice must be removed after two consecutive general federal elections of inactivity.

55.    Where voter rolls contain a large number of registrations that have been inactive for more than two general federal elections, it is an indication that a jurisdiction is failing to remove old, inactive registrations as required by NVRA Section 8(d)(1)(B).

56.    Oregon's voter rolls contain over 640,000 inactive registrations that show no voter activity for three or more consecutive general federal elections.

57.    Oregon's voter rolls contain over 570,000 inactive registrations that show no voter activity for four or more consecutive general federal elections.

58.    Oregon's voter rolls contain over 490,000 inactive registrations that show no voter activity for five or more consecutive general federal elections.

59.    On information and belief, Oregon's voter rolls contain many inactive registrations that have had no voter activity for six or more consecutive general federal elections.

60.    A high number of registrations that have been inactive for more than two consecutive general federal elections indicates that a jurisdiction is failing to remove old, inactive registrations as required by NVRA Section 8(d)(1)(B).

61.    The high number of old, inactive registrations on Oregon's voter rolls shows a statewide failure to conduct a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible under the NVRA, for which Defendants Griffin-Valade and the State of Oregon are liable.

62.    The high number of old, inactive registrations on Oregon's voter rolls shows that Defendant Griffin-Valade has failed in her duty, as Oregon's chief State election official, to coordinate State responsibilities under the NVRA.

63.    The fact that Oregon has a high number of old, inactive registrations on its rolls, and the previously cited facts showing that 29 Oregon counties removed few or no registrations under Section 8(d)(1)(B), that Oregon and 35 of its counties had *overall* registration rates exceeding 100%, and that Oregon has high *inactive* registration rates, are all consistent with each other, and, in combination, show that Oregon is failing to remove inactive registrations pursuant to Section 8(d)(1)(B) of the NVRA.

### *Defendants' Failure to Provide Confirmation Notice Data And Other NVRA-Related Data to the EAC*

64.    Sending Confirmation Notices is a necessary first step under Section 8(d)(1)(B) to removing potentially ineligible registrants from the voter rolls. A registrant's failure to respond to this notice makes the registration inactive and starts the NVRA's statutory "clock," after which that registration is cancelled.

65.     The     EAC's     voter     registration     survey,     available     online     at https://www.eac.gov/sites/default/files/EAVS%202022/2022_EAVS_FINAL_508c.pdf,     asked states, including Oregon, to report voters' responses to Confirmation Notices that were sent during the period from November 2020 to November 2022. In particular, the following survey questions asked states to supply the following information:

> A8b. <u>Notices received back from voter confirming registration</u>:
> The total number of notices returned that confirmed an individual was still eligible to vote in the jurisdiction.
>
> A8c. <u>Notices received back from voter confirming registration should be invalidated</u>:
> The total number of notices returned that confirmed an individual was no longer eligible to vote in the jurisdiction or no longer wanted to be registered to vote.
>
> A8d. <u>Notices returned as undeliverable</u>:
> The total number of notices returned to the election office because the U.S. Postal Service (USPS) could not deliver the notice to the voter.
>
> A8e. <u>Unreturned confirmation notices (neither received back from voters nor returned as undeliverable)</u>:
> Any notice that was sent to a voter but was not received back confirming registration (A8b), confirming invalidation (A8c), or returned as undeliverable (A8d).

*Id*. at 9.

66.     Oregon reported to the EAC that not a single one of its 36 counties provided any numerical data in response to survey questions A8b, A8c, A8d, or A8e for the period from November 2020 to November 2022. Instead, the data cells for each Oregon county merely declare, in the relevant columns, "Data not available."

67.     Oregon officials cannot ensure the accuracy and currency of Oregon's voter registration list unless they have the information about Confirmation Notices solicited by EAC survey questions A8b, A8c, A8d, and A8e.

68.     The fact that no Oregon county provided data in response to survey questions A8b and A8c shows that Oregon officials do not know how many Oregon voters responded to Confirmation Notices either by confirming their ongoing eligibility or by indicating that their registrations should be cancelled.

69.     The fact that no Oregon county provided data in response to survey questions A8d and A8e shows that Oregon officials do not know how many, if any, Confirmation Notices were either returned as undeliverable or not returned at all, and, in consequence, do not know how many Oregon voters who received Confirmation Notices should be placed in an inactive status pending removal after the statutory waiting period.

70.     Oregon also reported to the EAC that none of its 36 counties provided any data in response to survey questions A3g (address changes that crossed a jurisdiction's border), A9d (removal for a disqualifying felony conviction), or A9f (removal for being declared mentally incompetent), all of which are relevant to ensuring the accuracy and currency of Oregon's voter rolls and to complying with the NVRA.

71.     If a jurisdiction were conducting a general program that makes a reasonable effort to cancel the registrations of ineligible voters as required by the NVRA, it could comply with its federal reporting obligations to the EAC.

72.     Defendants' failure to satisfy their federal reporting obligations to the EAC suggests that they are not conducting a general program that makes a reasonable effort to cancel the registrations of ineligible voters as required by the NVRA.

### Defendants' Failure to Provide Records Plaintiffs Requested
### Pursuant to Section 8(i) of the NVRA

73.     On August 4, 2023, Plaintiff Judicial Watch wrote a letter to Defendant Griffin-Valade on a number of NVRA-related subjects, including the State's low number of removals

under Section 8(d)(1)(B). The letter also requested seven categories of public records pursuant to Section 8(i) of the NVRA. The second request, quoting the language of Section 8(i)(2), sought a list "of the names and addresses of all persons to whom notices described in 52 U.S.C. § 20507(d)(2) [*i.e.*, Confirmation Notices] were sent, and information concerning whether or not each such person responded to the notice." Other requests sought records relating to communications, list maintenance manuals, and audits.

74.    On September 15, 2023, Greg Bergerson, OCVR Support Desk Analyst, from Defendant Griffin-Valade's office responded by means of an email. In response to the second request, Mr. Bergerson stated:

> After internal review, we have identified significant additional labor cost to provide a full data set of returned voter notification cards (VNCs). Counties have historically used slightly different processes and have latitude to define some process steps in our current system. Researching this historical information would require significant consultation with county officials, including some who may have retired, and significant additional review of data by the SOS after such consultation. We estimate this work would take approximately 5,000 hours to complete due to the level of customization required for each of the 36 counties in Oregon.

75.    The foregoing response shows that Defendants have failed to comply with Section 8(i) and 8(i)(2) of the NVRA, which specifically required them to maintain and provide for public inspection and photocopying at a reasonable cost "the names and addresses of all persons to whom" Confirmation Notices were sent "and information concerning whether or not each such person responded to the notice."

76.    The NVRA and related federal regulations require Oregon, and not its counties, cities, or local authorities, to maintain and make available statewide records of Confirmation Notices sent and of responses to them. 52 U.S.C. § 20507(i) ("Each State shall …"); 11 C.F.R. § 9428.7(a), (b)(8) (chief state election official "shall" report the "statewide number" of

Confirmation Notices and "the statewide number of responses").

77.     Defendants cannot conduct a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible by reason of a change of residence, unless Defendants have easy access to local election authorities' list maintenance records, and, in particular, access to their data and statistics concerning the mailing and disposition of Confirmation Notices.

78.     Defendant Griffin-Valade cannot fulfill her statutory duty as Oregon's Chief State Election Official to be responsible for the coordination of State responsibilities under the NVRA, unless she has access to local election authorities' list maintenance records, and, in particular, access to their data and statistics concerning the mailing and disposition of Confirmation Notices.

79.     The NVRA supersedes and preempts any Oregon law or practice that

a.     restricts Defendants' access to local election authorities' list maintenance records, including access to data regarding the mailing of and responses to Confirmation Notices;

b.     diminishes the responsibility of the Chief State Election Official to coordinate State responsibilities under the NVRA;

c.     assigns ultimate responsibility for conducting NVRA-related tasks to county, city, or local officials; or

d.     assigns ultimate responsibility for performing NVRA-mandated public record obligations to county, city, or local officials.

***The Interests of the Plaintiffs***

80.     Plaintiff Judicial Watch's mission is to promote transparency, integrity, and accountability in government and fidelity to the rule of law. The organization, which has been in

- 16 -

existence since 1994, fulfills its mission through public records requests and litigation, among other means.

81.    Judicial Watch is supported in its mission by hundreds of thousands of individuals across the nation. An individual becomes a member of Judicial Watch by making a financial contribution, in any amount, to the organization. Members' financial contributions are by far the single most important source of income to Judicial Watch and provide the means by which the organization finances its activities in support of its mission. Judicial Watch in turn represents the interests of its members.

82.    Over the past several years, Judicial Watch's Oregon members; Plaintiff Suni Danforth, who is a Judicial Watch member; and Plaintiff Hannah Shipman, who is a Constitution Party member, have become increasingly concerned about the state of the nation's voter registration rolls, including whether state and local officials in Oregon are complying with the NVRA's voter list maintenance obligations. They are concerned that failing to comply with these obligations impairs the integrity of elections by increasing the opportunity for ineligible voters to receive and cast ballots for federal elections in Oregon.

83.    Defendants' failure to comply with their NVRA voter list maintenance obligations burdens the federal and state constitutional rights to vote of all individual members of Judicial Watch and the Constitution Party who are lawfully registered to vote in Oregon, including Suni Danforth and Hannah Shipman, by undermining their confidence in the integrity of the electoral process, discouraging their participation in the democratic process, and instilling in them the fear that their legitimate votes will be nullified or diluted by unlawful ones.

84.    Protecting the voting rights of Oregon members who are lawfully registered to vote in Oregon is germane to both Judicial Watch's and the Constitution Party's missions. It also is

well within the scope of the reasons why members join Judicial Watch and the Constitution Party and support their missions.

85.    Because the relief sought herein will inure to the benefit of Judicial Watch and Constitution Party members who are lawfully registered to vote in Oregon, neither the claims asserted nor the relief requested requires the participation of all of Judicial Watch's or the Constitution Party's individual members in Oregon.

86.    In response to the concerns of its members, Judicial Watch commenced a nationwide program to monitor state and local election officials' compliance with their NVRA list maintenance obligations. As part of this program, Judicial Watch utilizes public records laws to request and receive records and data from jurisdictions across the nation about their voter list maintenance efforts. It then analyzes these records and data and publishes the results of its findings to the jurisdictions, to its members, and to the general public.

87.    Judicial Watch's concerns with Oregon's list maintenance practices led it to send correspondence to Secretary Griffin-Valade in August 2023, and to send further correspondence threatening legal action (along with the Constitution Party and Suni Danforth) in July 2024 and in August 2024. This correspondence noted Oregon's apparent non-compliance with the NVRA. Judicial Watch's concerns also led it to analyze the State's responses, and to conduct multiple analyses of Oregon's voter rolls, total registration rates, Section 8(d)(1)(B) removal rates, and inactive rates.

88.    Judicial Watch has expended substantial resources, including staff and attorney time, investigating Defendants' programs concerning their NVRA voter list maintenance obligations, communicating with Oregon officials about addressing non-compliance, and communicating with concerned members about these efforts.

89.     The resources expended by Judicial Watch to investigate and communicate with Defendants in order to address and counteract their failure to comply with their NVRA voter list maintenance obligations, and to communicate with its own members about these matters, are distinct from and above and beyond Judicial Watch's regular, programmatic efforts to monitor state and local election officials' NVRA compliance.

90.     Were it not for Defendants' failure to comply with their NVRA voter list maintenance obligations, Judicial Watch would have expended these same resources on its regular, programmatic activities or would not have expended them at all. Instead, it diverted its resources to counteract Defendants' noncompliance and to protect members' rights.

91.     Judicial Watch's core business activity and mission is to ensure government accountability and transparency. As part of that mission, Judicial Watch regularly requests public records from state and federal government agencies to ensure those agencies are compliant with the law.

92.     By failing to disclose the information required by the NVRA and federal regulations, Defendants have interfered with Judicial Watch's core business activity and mission, making it impossible to fully determine the extent of Defendants' compliance with the NVRA without initiating this lawsuit.

93.     As a result of Defendants' actions and omissions, Judicial Watch has had to involuntarily divert its resources from its core business activity and mission in order to counteract Defendants' noncompliance.

94.     Plaintiff Constitution Party of Oregon is a registered political party in the State of Oregon. The Constitution Party of Oregon, along with its members, supporters, and candidates, exercise their rights under the First and Fourteenth Amendments to join together and associate in

support of their common political beliefs.

95.    The Constitution Party of Oregon organizes, selects, and promotes the election of party standard bearers and others who promote its beliefs.

96.    To these ends, the Constitution Party of Oregon purchases and relies on Oregon's voter rolls to identify in-state voters and to contact them and encourage them to assist the candidates it supports by learning about the party and its beliefs, volunteering, organizing, contributing, and voting. These voter-contact and election-related activities are core activities of the Constitution Party, and, indeed, are core activities of any political party.

97.    Acquiring Oregon's voter rolls is necessary in order to achieve political success in the state of Oregon.

98.    Oregon's voter rolls may be obtained at a far lower cost than any other commercially available voter database, which is a major reason why the Constitution Party relies on the state's rolls.

99.    The Constitution Party of Oregon's ability to contact eligible Oregon voters is interfered with and made more difficult because Defendants' failure to conduct list maintenance required by the NVRA causes Oregon's voter rolls to have many more outdated and ineligible registrations—both on its active and inactive voter lists—than they otherwise would.

100.    Defendants' failure to timely remove ineligible registrants from Oregon's voter rolls causes the Constitution Party of Oregon to waste significant time, effort, and money trying to contact voters, both by mail and in person, who are listed on the rolls but who no longer live at the registered address or who are deceased.

## COUNT I

### (Violation of Section 8(a)(4) of the NVRA, 52 U.S.C. § 20507(a)(4))

101.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

102.    Plaintiffs Judicial Watch, Constitution Party of Oregon, Suni Danforth, and Hannah Shipman are persons aggrieved by a violation of the NVRA, as set forth in 52 U.S.C. § 20510(b).

103.    Defendants have failed to fulfill their obligations under Section 8(a)(4) of the NVRA to conduct a general program that makes a reasonable effort to cancel the registrations of Oregon voters who have become ineligible by reason of a change of residence.

104.    Defendant Griffin-Valade has failed in her duty as Oregon's chief State election official to coordinate State responsibilities under the NVRA.

105.    Plaintiffs have suffered and will continue to suffer irreparable injury as a direct result of Defendants' failure to fulfill their obligations under the NVRA.

106.    Plaintiffs have no adequate remedy at law.

## COUNT II

### (Violation of Section 8(i) of the NVRA, 52 U.S.C. § 20507(i))

107.    Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

108.    Defendants have failed to fulfill their obligations under Section 8(i) of the NVRA to make available to Plaintiffs "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."

109.    Plaintiffs have suffered, and will continue to suffer, irreparable injury as a direct result of Defendants' failure to fulfill their obligations under Section 8(i) of the NVRA.

110.    Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for entry of a judgment:

a.     Declaring Defendants to be in violation of Section 8(a)(4) of the NVRA;

b.     Permanently enjoining Defendants from violating Section 8(a)(4) of the NVRA;

c.     Ordering Defendants to develop and implement a general program that makes a reasonable effort to remove the registrations of ineligible registrants from the voter rolls in Oregon;

d.     Declaring that the NVRA supersedes and preempts any contrary Oregon law or practice;

e.     Declaring that Defendants have violated Section 8(i) of the NVRA;

f.     Permanently enjoining Defendants from refusing to allow Plaintiffs to inspect and copy the requested records at a reasonable cost;

g.     Ordering Defendants to pay Plaintiffs' reasonable attorney's fees and costs; and

h.     Awarding Plaintiffs such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated:  October 23, 2024    By:    s/ Stephen J. Joncus
**Stephen J. Joncus**, # 013072
JONCUS LAW P.C.
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
Telephone: (971) 236-1200
steve@joncus.net

**Robert D. Popper***
**Eric W. Lee***
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024
Phone: (202) 646-5172
rpopper@judicialwatch.org

**T. Russell Nobile**\*
JUDICIAL WATCH, INC.
Post Office Box 6592
Gulfport, Mississippi 39506
Phone: (202) 527-9866
rnobile@judicialwatch.org

*Attorneys for Plaintiffs*

*\* Application for admission pro hac vice
forthcoming*