IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

JUDICIAL WATCH, INC.;
CONSTITUTION PARTY OF OREGON;
SUNI DANFORTH; and HANNAH SHIPMAN,

        Plaintiffs,

    v.

TOBIAS READ, *in his official capacity
as the Oregon Secretary of State*; and
THE STATE OF OREGON,

        Defendants.

Case No. 6:24-cv-01783-MC

OPINION AND ORDER

_____

MCSHANE, Judge:

      Plaintiffs bring this action alleging that the State of Oregon and its chief elections officer,

the Secretary of State,[1] failed to comply with two obligations under Section 8 of the National

Voter Registration Act ("NVRA"). Pls.' First Am. Compl., ECF No. 12 ("FAC").[2] Specifically,

in Count I they claim that Oregon failed to conduct a general program to remove ineligible voters

from voter registration rolls pursuant to § 8(a)(4), 52 U.S.C. § 20507(a)(4). *Id.* at ¶¶ 127–32. In

_____

[1] Plaintiffs filed this action naming the then-acting Secretary of State, Lavonne Griffin-Valade, as a defendant. *See* ECF No. 1. Tobias Read has since been sworn in as Oregon's Secretary of State, and therefore "is automatically substituted as a party" for his predecessor. *See* Fed. R. Civ. P. 25(d).

[2] Plaintiffs filed their Complaint on October 23, 2024. Compl., ECF No. 1. Defendants moved to dismiss on December 30, 2024. Def.'s Mot. Dismiss, ECF No. 10. Plaintiffs filed an Amended Complaint on January 10, 2025.

Count II they claim that Oregon failed to make available all records concerning the implementation of such a program pursuant to § 8(i), 52 U.S.C. § 20507(i). *Id.* at ¶¶ 133–36.

Defendants, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), move to dismiss the claims for lack of standing and failure to give adequate notice. Defs.' Mot. Dismiss, ECF No. 13.[3] The Court held oral argument on June 18, 2025. *See* Off. Tr., ECF No. 31. The Court is also in receipt of the U.S. Department of Justice's Statement of Interest, ECF No. 28, and Plaintiffs' Notices of Supplemental Authority, ECF Nos. 26 and 33.

For the reasons discussed below, the Court GRANTS in part and DENIES in part Defendants' Motion to Dismiss.

## **BACKGROUND**

### **I. National Voter Registration Act**

Congress enacted the National Voter Registration Act in 1993, articulating in its opening lines the following purpose:

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
>
> (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
>
> (3) to protect the integrity of the electoral process; and
>
> (4) to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b)(1)–(4).

Section 8 of the NVRA establishes the requirements that states must follow in the administration of voter registration for federal elections. Generally, Section 8 prohibits states

---

[3] The Court understands that Defendants plan to post-answer move for the State's dismissal under Federal Rules of Civil Procedure 12(c) and 12(h)(3) should this Motion be denied. Defs. Mot. n.2.

from removing registered voters from official voter lists unless the registrant requests it, state law compels it, or Section 8(a)(4) necessitates it. § 20507(a)(3). Under Section 8(a)(4), states are to "conduct a general program that makes a reasonable effort to remove . . . from the official lists of eligible voters" the names of voters who have become ineligible by reason of death or change in residence. § 20507(a)(4). For those who have changed residences, removal from official lists is contingent upon the registrant either (1) providing written confirmation of the change or (2) failing to timely respond to an address-confirmation notice as described by Section 8(d)(2) ("Confirmation Notices"). § 20507(d)(1). Confirmation Notices must incorporate a "prepaid and pre-addressed return card" and must request that the registrant confirms his or her address. § 20507(d)(2). If a registrant fails to respond to a Confirmation Notice and fails to vote in two general elections, the registrant is then removed from the official voter rolls. § 20507(d)(1).

To maintain procedures consistent with these rules, the NVRA directs each state to "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities." § 20509. In Oregon, the chief elections officer is the Secretary of State. ORS 246.110. Section 8(i) further directs each state's official to "maintain for at least 2 years" and "make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." § 20507(i). Those records must "include lists of the names and addresses of all persons to whom [Confirmation Notices] are sent, and information concerning whether or not each such person has responded to the notice." § 20507(i)(2).

In the event a person "is aggrieved by a violation of" the NVRA, the Act provides a private right of action. § 20510(b). To exercise that right, the aggrieved person must first, in most

circumstances, provide written notice of the violation to the chief election official of the state involved prior to commencing a lawsuit. *Id.*

## II. Facts and Parties

The Plaintiffs bringing this lawsuit are Judicial Watch, the Constitution Party of Oregon, Suni Danforth, and Hannah Shipman. Judicial Watch is an educational nonprofit organization based in D.C. and dedicated to promoting fidelity to the rule of law and integrity, transparency, and accountability in government. FAC ¶¶ 4, 80. The Constitution Party is a registered political party in Oregon devoted to electing candidates and to recruiting and maintaining party members. *Id.* at ¶ 5. Ms. Danforth is a member of Judicial Watch, as well as a resident and registered voter of Umatilla County, Oregon. *Id.* at ¶ 6. Ms. Shipman is a member of the Constitution Party, as well as a resident and registered voter of Marion County, Oregon. *Id.* at ¶ 7.

In June 2023, the U.S. Election Assistance Commission ("EAC") published is biennial report to Congress as required by law. 52 U.S.C. § 20508(a)(3); *Id.* at ¶¶ 22–23. States are mandated by federal regulation to provide election data to the EAC for use in this report, which covers state voter registration practices. *See* 11 C.F.R. § 9428.7(b). Plaintiffs reviewed the EAC Report cataloguing data for Oregon for the year 2022 and concluded the following: First, "the largest number of removals under the NVRA are usually made pursuant to Section 8(d)(1)(B), for failing to respond to a Confirmation Notice and failing to vote in two consecutive general federal elections." FAC ¶ 25. Second, Oregon's self-reported data showed "that 19 counties removed zero voter registrations from November 2020 to November 2022 pursuant to Section 8(d)(1)(B)." *Id.* at ¶ 26. And only "10 other counties removed 11 or fewer voter registrations from November 2020 to November 2022 pursuant to Section 8(d)(1)(B)." *Id.* at ¶ 27. Included in that group were individual Plaintiffs' resident counties, Umatilla and Marion. *Id.* Plaintiffs

contrasted these findings with data from the U.S. Census Bureau which found that 14.5% of Oregon residents moved addresses over a one-year period and approximately 289,132 residents left the state in 2022 and 2023. *Id.* at ¶¶ 30–31. From this data, Plaintiffs concluded that "[t]here is no possible way [Oregon's] counties can be conducting a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible because of a change of residence while removing so few registrations under Section 8(d)(1)(B)." *Id.* at ¶ 29.

Plaintiffs also "compared the total number of registrants, active and inactive, on Oregon's voter rolls with the most recent five-year American Community Survey estimates from the Census Bureau of the citizen voting-age populations of Oregon's counties." *Id.* at ¶ 39. It "indicated that 35 of Oregon's 36 counties had more voter registrations than citizens over the age of 18." *Id.* Excluding inactive registrations, "the same study showed that 10 of Oregon's 36 counties had more active registrations than citizens over the age of 18." *Id.* These high registration rates, according to Plaintiffs, evidence "a statewide failure to conduct a general program that makes a reasonable effort to cancel the registrations" of ineligible voters. *Id.* at ¶ 41.

Finally, Plaintiffs calculated Oregon's percentage rate for inactive registrations and compared it to the national inactive registration rate of 11%. *Id.* at ¶¶ 45–49. "Oregon's inactive registration rate is about 20%. . . . Oregon's median county inactive registration rate is about 18%, and its largest county, Multnomah, has an inactive registration rate of about 27%." *Id.* at ¶ 50–51. Oregon's voter rolls also contain high counts of inactive registrations that show no voter activity for up to five consecutive general federal elections. *Id.* at ¶¶ 56–58. Plaintiffs believe this too indicates a statewide failure to conduct a "program that makes a reasonable effort to cancel the registrations of voters who have become ineligible under the NVRA." *Id.* at ¶ 61.

On August 4, 2023, Judicial Watch wrote a letter to the Secretary regarding several NVRA-related subjects, including the Oregon's low number of Section 8(d)(1)(B) removals. *Id.* at ¶ 73. The letter also requested the production of seven categories of public records pursuant to Section 8(i) of the NVRA. Marshall Decl. Ex. 1, at 7–10, ECF No. 11. Specifically, the request sought:

> 1. Copies of the state's most recent voter registration database, including fields indicating each registered voters' name, full date of birth, home address, most recent voter activity, and active or inactive status.

> 2. A list of the names and addresses of all persons to whom notices described in 52 U.S.C. § 20507(d)(2) were sent, and information concerning whether or not each such person responded to the notice.

> 3. Communications concerning the EAC's 2022 Election Administration and Voting Survey, including, but not limited to, responses to Section A of that survey, and any records provided along with those responses.

> 4. All manuals, training materials, protocols, written standards, and official guidance concerning efforts to ensure the accuracy and currency of official lists of eligible voters.

> 5. All contracts with the U.S. Postal Service or any other federal agency to provide change-of-address information concerning registered voters.

> 6. All records concerning any internal or external audit, evaluation, assessment, review, analysis, critique, or request for or response to any of the foregoing, relating to the accuracy and currency of official lists of eligible voters.

> 7. Records sufficient to support any explanation you provided in response to the inquiries contained in this letter.

*Id.* at 9–10.

Greg Bergerson, Support Desk Analyst in the Oregon Secretary of State's office, responded by email on September 15, 2023. FAC ¶ 74. As to the second request, he stated:

> After internal review, we have identified significant additional labor cost to provide a full data set of returned voter notification cards (VNCs). Counties have historically used slightly different processes and have latitude to define some process steps in our current system. Researching this historical information would require significant consultation with county officials, including some who may have retired, and significant additional review of data by the SOS after such consultation. We estimate this work would take approximately 5,000 hours to complete due to the level of customization required for each of the 36 counties in Oregon.

*Id.* Judicial Watch did not respond to that email, and its subsequent correspondence did not address the Office's cost estimate. *See* Marshall Decl., Ex. 1. Instead, Judicial Watch sent correspondence to then-Secretary Lavonne Griffin-Valade in July and August 2024 threatening legal action for what Plaintiffs perceived to be Oregon's apparent non-compliance with the NVRA's voter roll maintenance provision. *Id.* at 1–6 (Plaintiffs' pre-suit notice letters detailing the facts that show "violations of the list maintenance provision of the NVRA"); FAC ¶ 87.

On October 23, 2024, Plaintiffs filed this action asserting two counts for violations of the NVRA. Compl. ¶ 1, ECF No. 1; *see also* FAC (asserting the same). Count I, Plaintiffs' "list maintenance claim," alleges that Defendants violated § 20507(a)(4) by failing to conduct a general program that makes reasonable efforts to cancel registrations of voters who have become ineligible to vote. Count II, Plaintiffs' "public records claim," alleges that Defendants violated § 20507(i) by failing to maintain and provide for public inspection and photocopying at a reasonable cost the names and addresses of all persons to whom Confirmation Notices were sent, as well as information concerning whether each such person responded to the notice. Plaintiffs seek declaratory and injunctive relief, requesting an order that compels Defendants to develop and implement a program to remove ineligible registrants from voters rolls and that enjoins Defendants from refusing to allow Plaintiffs to inspect and copy records at a reasonable cost. FAC ¶¶ 25–26.

Defendants move to dismiss both Counts.

## LEGAL STANDARD

### I. Rule 12(b)(1)

A motion to dismiss made under Rule 12(b)(1) challenges the court's subject-matter jurisdiction over a case. Fed. R. Civ. P. 12(b)(1). Because it involves a court's authority to hear a case, subject-matter jurisdiction can never be waived or forfeited. *U.S. v. Cotton*, 535 U.S. 625, 630 (2002). Such challenges can be either "factual" or "facial." *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1056 n.1 (9th Cir. 2023) (quoting *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014)). "In a factual challenge, the moving party 'introduc[es] evidence outside the pleadings' and seeks to have the existence of jurisdiction determined as a factual matter." *Id.* In a facial challenge, like the one Defendants bring here, "the moving party accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction." *Id.* (cleaned up). District courts evaluate facial challenges to jurisdiction under the familiar Rule 12(b)(6) standard. *Id.* The court may also "consider certain materials, such as matters of judicial notice or documents incorporated by reference into the complaint." *See Wong v. Fagan*, Case No. 3:22-cv-01714-SB, .2023 WL 5726265, at *6 (D. Or. June 30, 2023) (citations omitted).

### II. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). When considering a motion to dismiss, the

court must accept all allegations of material fact as true and construe those facts in the light most favorable to the non-movant. *Burgert v. Lokelani Bernice Pauahi Bishop Tr.*, 200 F.3d 661, 663 (9th Cir. 2000). But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

## DISCUSSION

### I. Count I: List Maintenance Claim

Defendants move to dismiss Count I, arguing that Plaintiffs lack Article III standing.

To satisfy Article III of the Constitution, plaintiffs bringing claims in federal court must demonstrate their "standing" as to each claim and each form of relief sought. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (citations omitted); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). To show standing, a plaintiff must establish (1) they suffered an "injury in fact" (2) that is "fairly traceable" to the actions of the defendant and (3) likely to be "redressed by a favorable decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 56–61 (1992)). A "lack of Article III standing requires dismissal for lack of subject matter jurisdiction." *Maya*, 658 F.3d at 1067 (citations omitted).

As relevant here, an injury in fact is one which stems from "an invasion of a legally protected interest" that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). An injury is "concrete" when it is real and not abstract; "particularized" when it impacts a plaintiff in a personal and individual way; and "imminent" when it is certainly impending. *E.g.*, *Spokeo*, 578 U.S. at 339–40 (cleaned up); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "[A]n abstract, theoretical concern will not do." *Pierce v. Ducey*, 965 F.3d 1085, 1089 (9th Cir. 2020). Because "[i]njury in fact is a constitutional requirement, . . . Congress cannot erase Article III's standing requirements by

granting the right to sue to a plaintiff who would not otherwise have standing.'" *Spokeo*, 578 U.S. at 339.

Here, Defendants argue that the harms alleged by Plaintiffs are too abstract to be concrete, too speculative to be imminent, and too general to be particularized. Further, Defendants contend that the Constitution Party alleges harms that fail to satisfy the applicable injury-in-fact requirement and fall outside of the NVRA's zone of interest. Plaintiffs disagree, asserting that they have adequately alleged harms that confer individual and associational standing as to all Plaintiffs and organizational standing as to the Constitution Party.[4] For the reasons explained below, the Court concludes that only the Constitution Party has plausibly alleged standing.

### A. Plaintiffs' Individual and Associational Standing

To allege a cognizable injury in fact, Plaintiffs must plead a particularized injury that "affect[s] the plaintiff in a personal and individual way." *Gill v. Whitford*, 585 U.S. 48, 49 (2018). "An interest shared generally with the public at large in the proper application of the Constitution and laws will not do." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 64 (1997); *see also Pierce*, 965 F.3d at 1089. Similarly, allegations of possible future injury are insufficient to establish the actual or imminent requirement. *Clapper*, 568 U.S. at 409.

Here, Plaintiffs allege that Defendants' failure to comply with the NVRA's voter list maintenance obligations has injured them in the following ways: increased concern that "the integrity of elections" is impaired by "the opportunity for ineligible voters to receive and cast ballots"; undermined "confidence in the integrity of the electoral process"; discouraged

---

[4] Plaintiffs do not argue that Judicial Watch has organization standing. *See* Pls.' Resp. 6, n.2, ECF No. 17.

"participation in the democratic process"; and "fear that their legitimate votes will be nullified or diluted by unlawful ones." FAC ¶¶ 82–83; *see also* Pls.' Resp. 24.

These allegations lack both the particularity and the imminency required by Article III. Nothing alleged in the FAC dictates how these harms are specific to these Plaintiffs: neither Ms. Danforth nor Ms. Shipman allege that they were personally prevented from voting, that some inaccuracy caused a delay or mishandling of their ballots, or that anything specific happened in their voting experience at all. The FAC lacks any factual allegations that indicate Plaintiffs have some greater stake in the outcome of this suit than any other citizen. Instead, they raise harms that could be shared equally by every Oregonian voter. "[R]aising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573–74.

Plaintiffs' allegations are also problematically speculative. Plaintiffs do not allege that voter fraud is occurring or that any inactive voter received and cast a ballot in error. Rather, Plaintiffs allege that they are "concerned" that Oregon's practices have impaired the integrity of Oregon's elections by "increasing *the opportunity* for ineligible voters to receive and cast ballots." FAC ¶ 82. Plaintiffs' ill-defined "fear that their legitimate votes will be nullified or diluted by unlawful ones" requires the fruition of a chain of events, none of which have been plausibly alleged to be "certainly impending." *Clapper*, 416; *see also Lake v. Fontes*, 83 F. 4th 1199, 1204 (9th Cir. 2024) (dismissing an "election manipulation" case for lack of standing because the complaint relied on a "long chain of hypothetical contingencies"). For Plaintiffs' injuries to materialize, "an inactive voter must receive a ballot, that person must be ineligible to

vote, that person must submit their ballot, a county clerk must mistakenly identify the ballot as

the ballot of an active voter, and the vote must be counted." Def.'s Mot. 9. When an injury

depends on a "speculative chain of possibilities," it is not "certainly impending or . . . fairly

traceable." *Clapper,* at 414. Plaintiffs' vote dilution fear is rendered more implausible by the fact

that Oregon "voters whose registrations are inactive are not eligible to vote," *Whitehead v.

Fagan*, 369 Or. 112, 115 (2021), and do not receive ballots, ORS 247.013(7), 254.470(2).

Plaintiffs are not permitted to "manufacture standing merely . . . based on their fears of

hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.

In response, Plaintiffs point to cases where district courts from other circuits accepted

undermined electoral confidence as an adequate injury in fact. *See Jud. Watch, Inc. v. Griswold*,

554 F. Supp. 3d 1091 (D. Colo. 2021); *Jud. Watch, Inc. v. King*, 993 F. Supp. 2d 919 (S.D. Ind.

2012). Neither persuades the Court here. In *Griswold*, the court rejected as too hypothetical and

generalized the plaintiffs' allegations that "bloated voter rolls could lead to fraudulent votes,

which could diminish or dilute the individual plaintiffs' votes." *Griswold*, 554 F. Supp. 3d at

1103. The court accepted, however, the plaintiffs' allegations that their confidence had been

undermined, finding those allegations not speculative because the fear already existed and not

generalized because there was no indication those fears were shared by all. *Id.* at 1103–04. In

*King*, the court likewise accepted an undermined confidence theory, explaining that "[t]here can

be no question that a plaintiff who alleges that his right to vote has been burdened by state action

has standing to bring suit to redress that injury." *King*, 993 F. Supp. 2d at 924; *see also Green v.

Bell*, 2023 WL 2572210, *4 (W.D.N.C. 2023) (accepting both theories). For the reasons already

explained, this Court does not find the reasoning of *Griswold* or *King* compelling. Moreover,

with the acknowledgement that there has been a recent outpour of similar cases filed nationally

and decided in varying ways, this Court is guided by the Ninth Circuit's decisions. Where previous plaintiffs have alleged that they are injured by "a lack of confidence in the integrity of the election system," the Ninth Circuit has held that "that alleged injury represents nothing more than the 'kind of speculation that stretches the concept of imminence beyond its purpose.'" *Thielman v. Griffin-Valade*, No. 23-35452, 2023 WL 8594389, at *1 (9th Cir. Dec. 12, 2023); *see also Lake*, 83 F.4th at 1204; *Election Integrity Project, Inc. v. Weber*, 113 F. 4th 1072, 1098 n.13 (9th Cir. 2024) ("To our knowledge, every court to have considered a 'vote dilution' claim analogous to the one raised by [plaintiff] in this case has rejected the claim.") (collecting cases). For those reasons, the Court concludes that the individual Plaintiffs here have not alleged a cognizable injury in fact, and therefore they have failed to establish Article III standing to sue.

As to Judicial Watch, "[a]n association has standing to bring suit on behalf of its members" only "when its members would otherwise have standing to sue in their own right." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 181 (2000). Because the Court has found that the individual Plaintiffs lack standing to sue in their own right, Judicial Watch's assertion of associational standing to bring suit on behalf of its members likewise fails.

### B. The Constitution Party's Organizational Standing

The Constitution Party's organizational standing presents a different issue.

Unlike associational standing, organizational standing arises where an organization has standing to sue on its own behalf for injuries the organization has sustained. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n.19 (1982)).[5] "In doing so, however, organizations must satisfy the usual

---

[5] The Court is in receipt of Plaintiffs' supplemental filing that highlights the Ninth Circuit's recent order to vacate and grant a rehearing en banc of *Ariz. Alliance for Retired Americans v. Mayes*, 117 F. 4th 1165 (9th Cir. 2024). *See*

standards for injury in fact, causation, and redressability that apply to individuals." *Id.* (citing *Havens Realty*, 455 U.S. at 378–79). Organizational standing does not exist merely because the organization "diverts its resources in response to a defendant's actions." *Id.* at 395 (citing *Havens Realty*, 455 U.S. at 363). Rather, the defendant's actions must have "directly affected and interfered with [the organizations] core business activities." *Id.*

Here, the FAC alleges that the Constitution Party "purchases and relies on Oregon's voter rolls to identify in-state voters and to contact them and encourage them to assist the candidates it supports." FAC ¶ 96. Plaintiffs contend "[t]hese voter-contact and election-related activities are core activities of the Constitution Party," as they are "of any political party." *Id*. However, the Constitution Party's ability to contact eligible voters is impeded "because Defendants' failure to conduct list maintenance required by the NVRA causes Oregon's voter rolls to have many more outdated and ineligible registrations—both on its active and inactive voter lists—than they otherwise would." *Id.* at ¶ 100. As a result, the Constitution Party "waste[s] significant time, effort, and money trying to contact voters . . . who are listed on the rolls but who no longer live at the registered address or who are deceased." *Id.* at ¶ 101. The costs and decreased results have forced the Constitution Party "to adjust its activities." *Id.* at ¶¶ 108–09. And further, "[i]f Oregon's voter rolls did not contain so many outdated and ineligible registrations," Plaintiffs allege "the total number of registrations in Oregon would be lower, and, consequently, the raw number of additional registrations the Constitution Party needs to" maintain its status as a minor political party "would also be lower." *Id.* at ¶¶ 122–25.

---

Notice, ECF No. 26; *see also Ariz. All. for Retired Ams. Priorities USA v. Mayes*, No. 22-16490, 2025 U.S. App. LEXIS 6367 (9th Cir. March 18, 2025). Although *Mayes* was this Circuit's precedent on organizational standing, the Ninth Circuit's decision to vacate it does not, of course, alter the precedential effect of the 2024 Supreme Court case on which *Mayes* relied, *Hippocratic Med.*, 602 U.S. 367, (2024). The Court therefore remains bound to the *Hippocratic Med.*'s holding: "that neither the frustration of a mission nor the diversion of resources confers standing under Article III." *Id.*

Defendants attack the plausibility of these allegations. Because the voter lists distinguish between active and inactive voters, and because inactive registrants do not receive ballots and cannot vote until updated, any resources or time wasted on inactive voters is attributable to the Constitution Party's choices—not inaccurate lists. Similarly, Defendants argue that the FAC fails to allege sufficient facts to make plausible the alleged injuries arising out of the outdated registrations on the active list.

Perhaps most compellingly, Defendants highlight that many of injuries alleged by Plaintiffs amount to an assertion that Oregon's non-compliance with the NVRA has frustrated the Constitution Party's mission and caused it to spend more resources fulfilling that mission. *See Hippocratic Med.*, 602 U.S. at 394–95. In making this argument, Defendants rely on a recent Supreme Court opinion which clarified that an organization's impaired "ability to provide services and achieve their organizational missions . . . does not work to demonstrate standing." *Id.* at 394. Standing is not conferred "based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct." *Id.* Nor does it arise when an "organization's abstract social interests" are obstructed or the organization had to expend more time and resources, as organizations "cannot manufacture [their] own standing" by "spend[ing] their way in." *Id.* Rather, organizational standing exists when a defendant's actions "directly affect[] and interfere[] with" the organization's "core business activities." *Id.* at 395. Here, Defendants contend that the Constitution Party has not alleged that they were forced to divert resources away from their pre-existing activities, but rather, that they were forced to expend extra resources to conduct voter outreach and fulfill its mission. Such frustration-of-mission and diversion-of-resources arguments cannot prevail, according to Defendants.

On those points, the Court largely agrees. However, the Constitution Party raises one allegation that gives the Court pause: "The voter rolls also allow the Constitution Party to keep track of its own members whose registrations have become inactive." FAC ¶ 99. Of all the alleged harms, this one rises above a mere "frustration-of-purpose" argument. The Constitution Party has adequately alleged that it is a core function of its organization is to keep track of its members' statuses in order to notify when they have fallen inactive and to monitor the number of registrants in order to maintain its standing as a minor political party. If Constitution Party cannot monitor its members, it is plausible that it could lose its status as a minor party and no longer be entitled to limited liability or to nominate candidates. Accepting the allegations in the FAC as true and construing them in favor of Plaintiffs, the Constitution Party has plausibly alleged that outdated or inaccurate voter lists impair a core function of that organization. The Court finds that the Constitution Party has properly established standing.

### C. The Zone of Interest

"[A] plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citations omitted). Courts resolving this inquiry are to "determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). In the context of Administrative Procedure Act, for example, Congress conferred a broad cause of action to any "person 'aggrieved by agency action within the meaning of the relevant statute.'" *Id.* at 130; *see also Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153–54 (1970). Given that breadth, the Supreme Court said that the zone-of-interest test for the APA is "not 'especially demanding,' . . . 'foreclos[ing] suit

only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed Congress authorized that plaintiff to sue." *Lexmark Int'l*, 572 U.S. at 130 (cleaned up) (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). Here, the explicit purpose of the NVRA is to establish procedures that increase the number of eligible, registered citizens; to enhance the participation of eligible citizens in elections; and to protect the integrity of the electoral process and accuracy of voter rolls. § 20510(b)(1). Like the APA, Congress provided in the NVRA a private right of action broadly to any "person who is aggrieved by a violation of this chapter," limited specifically by the plaintiff's compliance with the NVRA's notice requirements. § 20510(b).

Defendants argue the Constitution Party cannot meet the requirements of the "zone of interest" test because the NVRA's purposes do not include the facilitation of political parties' voter outreach efforts nor support for their efforts to elect candidates, promote their platform, or maintain party status. Defs.' Mot. 20–22. Defendants construe the test too narrowly. A plaintiff's injury does not need to be explicitly enshrined in the relevant provision; it must be arguably within that zone. Here, the Constitution Party has adequately pled that its core-functions, which involve monitoring voter registration and increasing voter participation, have been hindered by non-compliance with the NVRA's list maintenance provision. The Court therefore declines to dismiss the Constitution Party's claim on a "zone of interest" argument at this time.

The Constitution Party has plausibly alleged standing to assert Count I. The Motion is therefore denied as to that Plaintiff. As to the remaining Plaintiffs, the Court grants the Motion and dismisses for lack of standing without prejudice.

**II. Count II: Public Records Claim**

 Defendants move to dismiss Count II, arguing that Plaintiffs failed to provide adequate notice before commencing a lawsuit on the public records claim. Defendants are correct.

 As explained above, the NVRA's private right of action imposes a mandatory notice requirement. To bring a civil action, the aggrieved party must first "provide written notice of the violation to the chief election official of the State involved." § 20510(b)(1). Once the notice is received, a party must generally wait 90 days before filing suit in order to allow the official an opportunity to correct the identified violation. § 20510(b)(2). If, however, the violation occurred on the eve of a federal election, the notice period changes: for violations that occur within 120 days of the election, the party need only wait 20 days and for violations that occur within 30 days of a federal election, the notice period is eliminated. § 20510(b)(2)–(3). Failing to provide the proper notice warrants dismissal under Rule 12(b)(6). *See National Council of La Raza v. Cegavske*, 800 F.3d 1032, 1042 (9th Cir. 2015); *Jud. Watch, Inc. v. Griswold*, 554 F. Supp. 3d at 1105.

 Here, the relevant timeline occurred as follows. On August 4, 2023, Judicial Watch wrote a letter to the Secretary requesting seven categories of documents. Marshall Decl. Ex. 1, at 7–10. A responsive email from the Secretary was sent following September, estimating that 5,000 hours of labor would be required to complete one aspect of Plaintiffs' order. *See* FAC ¶ 75. Instead of replying to this correspondence, Plaintiffs sent a notice letter on July 10, 2024, threatening to commence a lawsuit because "Oregon is not complying with its list maintenance obligations" under § 20507(a)(4). *Id.* at 3–6. Plaintiffs sent second letter on August 1, 2024, threatening the same. *Id.* at 1–2. Then, on October 23, 2024, Plaintiffs commenced their civil action. Here, they assert a public records claim alleging that Mr. Bergerson's email "response

shows that Defendants have failed to comply with Section 8(i) and 8(i)(2) of the NVRA, which specifically required them to maintain and provide for public inspection and photocopying at a reasonable cost 'the names and addresses of all persons to whom' Confirmation Notices were sent 'and information concerning whether or not each such person responded to the notice.'" FAC ¶¶ 75, 134.

Defendants moved to dismiss the public records claim, arguing that the Complaint fails to allege notice was provided as to that claim and indeed no notice was provided prior to Plaintiff filing that claim. In their responsive brief, Plaintiffs do not attempt to argue that they gave notice. Pls.' Resp. 28–29. Rather, Plaintiffs contend notice was not required for Plaintiffs' public disclosure claim because their FAC plausibly alleged an "ongoing" violation that was occurring when they filed on October 23, 2024—13 days before the next federal election. Accordingly, Plaintiffs believe they were permitted to avail themselves of the notice exclusion provided for violations that occur "within 30 days before the date of an election for Federal office." § 20510(b)(3).

In making their argument, Plaintiffs rely on a 2015 Ninth Circuit case: *National Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015). In *Cegavske*, the plaintiffs sent a notice letter to Nevada's Secretary stating that, based on their field investigations, Nevada was "systematically failing to" comply with Section 7 of the NVRA. *Id.* at 1035. The letter provided "substantial" evidence, including data from field investigations that discovered violations were "standard procedure" across Nevada's public assistance offices. *Id.* at 1036. Because the letter was sent 33 days before the next election, the plaintiffs believed they had to wait 20 days to file their civil action; they waited 32. *Id.* In their complaint, the plaintiffs alleged that "widespread ongoing noncompliance" and "systemic violations . . . caused by flawed practices and policies,

insufficient oversight and inadequate enforcement" were occurring and would continue. *Id.* at 1036–37. The district judge dismissed the case, holding that the plaintiffs were required to wait 90 days to file because the alleged violations occurred during the field investigations—over 120 days before the next election. *Id.* at 1038–39. The Ninth Circuit reversed. The issue came down to a central premise on which the Ninth Circuit disagreed: that there was no reason to believe the violations identified in the field investigations were still occurring when plaintiffs sent their letter and filed their complaint. *Id.* at 1042. By the Ninth Circuit's measure, it was "impossible" to read those allegations and conclude that there was no reasonable possibility that at least some of the violations were continuing as of the dates of the notice and complaint. *Id.* at 1044. The Ninth Circuit ultimately held that "[a] plaintiff can satisfy the NVRA's notice provision by plausibly alleging that an ongoing, systematic violation is occurring at the time the notice is sent or, if no notice is sent, when the complaint is filed within 30 days of a federal election." *Id.*

Although instructive, *Cegavske* is not factually reflective of this case. Unlike *Cegavske*, the Plaintiffs here provided no notice letter regarding any ongoing violations of the records disclosure rule. Plaintiffs point solely to their FAC, which fails to allege an "ongoing, systematic" NVRA violation. Nor does it allege one that was occurring at the time the Complaint was filed. Plaintiffs merely allege that on that one occasion they did not receive records the moment they were requested. *See* FAC ¶ 134 ("A disclosure violation occurred when Defendants failed to provide the requested records in response, and it was ongoing given that Plaintiffs had not received the records requested as of the filing of this action.") The factual allegations tie the alleged violation to a particular records request, on a single occasion, at a single office. In that way, the present matter is more aptly categorized as a discrete violation than an ongoing one. *See Cegavske*, at 1043 (clarifying that "[i]f Plaintiffs had provided notice of discrete violations that

had occurred more than 120 days before June 12, but had not occurred thereafter, they would have had to wait 90 days from the date of their notice before bringing suit"). Plaintiffs' assertion that the disclosure violation "was ongoing given that Plaintiffs had not received the records requested as of the filing of this action" does not overcome that. It cannot be said that simply being unfulfilled transforms any request into one that is categorically ongoing or systematic. Moreover, the facts as alleged suggest that Plaintiffs manufactured the "violation" with their conduct. As Defendants highlight: "Public records requests of all kinds frequently require conferral and discussion between the requestor and the agency to clarify exactly what is being requested, consider the manner in which the agency stores and accesses its records, and determine whether other records (of which the requestor may be unaware) could meet the requestor's needs for information more efficiently. Notice is not only statutorily required, it also facilitates that problem-solving process." Defs.' Mot. 24. By not responding to the cost estimate, Plaintiffs precluded the fulfillment of their request.

The Court therefore concludes that Plaintiffs failed to plausibly allege an ongoing violation was occurring at the time they filed. At best, Plaintiffs alleged a discrete violation that occurred in September 2023, over 120 days before the next federal election. Plaintiffs were therefore required to give the State notice and 90 days to cure before filing suit. They did not. Their claim must therefore be dismissed.

Notwithstanding that analysis, the Court is compelled to respond to the novel argument advanced by Plaintiffs' counsel at oral argument. Rather than repeat his earlier assertions that "statutory notice was not required for Plaintiffs' public disclosure claim under Section 8(i)," *see* Pls.' Resp. 28, counsel argued quite the opposite. He explained that he believes Plaintiffs

provided "not just technically adequate notice," but also what he "would call equitable notice." Trans. 30.

As Plaintiffs are aware, notice is sufficient "when it (1) sets forth the reasons that a defendant purportedly failed to comply with the NVRA, and (2) clearly communicates that a person is asserting a violation of the NVRA and intends to commence litigation if the violation is not timely addressed." *Jud. Watch, Inc. v. Pennsylvania*, 524 F. Supp. 3d 399, 409 (M.D. Pa. 2021) (citations omitted). The two letters to which counsel refers clearly warned of suing on the list-maintenance claim under § 8(a)(4). *See* Marshal Decl. Ex. 1 at 4 (stating "Facts Showing Violations of the List Maintenance Provisions of the NVRA"). But neither made clear a lawsuit was forthcoming for the public records request that Plaintiffs neglected to follow-up on. The notice letters did not further address the substance of the request, or which records were allegedly unlawfully withheld, they did not explain why Mr. Bergerson's response asking for further clarification violated the NVRA, they did not explain how the hourly estimate was unlawful, and there was nothing accompanying the letters demonstrating further conferral over the request occurred. The purpose of the NVRA's notice requirement is to allow the Secretary an opportunity to cure the identified violation. It would be completely unreasonable to expect that the Secretary would receive the letters and anticipate a lawsuit under Section 8(i). The letters therefore do not constitute adequate pre-suit notice for the records disclosure claim.

Because notice was required but not provided, Plaintiffs' Count II, asserting a violation of the NVRA's records disclosure provision, is dismissed without prejudice. Defendants' Motion is granted in part accordingly.

/ / /

/ / /

## <u>CONCLUSION</u>

For the reasons stated above, Defendants' initial Motion to Dismiss, ECF No. 10, is denied as MOOT and Defendants' amended Motion to Dismiss, ECF No. 13, is GRANTED in part and DENIED in part: Count I is dismissed for lack of standing as to all Plaintiffs except the Constitution Party of Oregon, which has adequately pled organizational standing, and Count II is dismissed for failure to give adequate notice.

IT IS SO ORDERED.

DATED this <u>5th</u> day of August 2025.


      <u>/s/ Michael McShane</u>
      **Michael J. McShane**
      **United States District Judge**